UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NICOLE ELLIOT, an individual, AMANDA PAIGE, an individual, and KATHRYN FRITSCHEL, an individual, for themselves and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>TRUSTED MEDIA BRANDS, INC., a Delaware Corporation,<br><br>Defendant. | Case No.: 22-cv-8740<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Nicole Elliot, Kathryn Fritschel, and Amanda Paige ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by and through their attorneys, make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to allegations specifically pertaining to themselves and their counsel, which are based on personal knowledge.

### I.  NATURE OF THE ACTION

1. This is a class action suit brought on behalf of all persons with Facebook accounts who have signed up for one or more of Defendant Trusted Media Brands, Inc.'s ("Defendant" or "TMBI") websites or newsletters and who watch videos on one or more of Defendant's websites, including without limitation, readersdigest.com, rd.com, thehealthy.com, familyhandyman.com, and tasteofhome.com.

2. Defendant develops, owns, and operates tasteofhome.com, a website that hosts and delivers hundreds of videos featuring products and resources related to cooking and recipes.

1

"Taste of Home is a popular American magazine and creator of many beloved cookbooks. Pulling in nearly 33 million visits a month on average, over 69 percent of tasteofhome.com's traffic comes from search — 99.96 percent of which is organic."[1]  Tasteofhome.com was one of the "Top 10 Food Websites by Traffic" in 2020.[2]

3. Defendant monetizes its website by knowingly collecting and disclosing its subscribers' personally identifiable information—including a record of every video clip they view—to Facebook, without proper disclosure or consent.

4. The United States Congress passed the Video Privacy Protection Act ("VPPA") in 1988, seeking to confer onto consumers the power to "maintain control over personal information divulged and generated in exchange for receiving services from video tape service providers." S. Rep. No. 100-599, at 8. "The Act reflects the central principle of the Privacy Act of 1974: that information collected for one purpose may not be used for a different purpose without the individual's consent." *Id.*

5. Defendant violated the VPPA by knowingly and illegally transmitting Plaintiffs' and the putative class's personally identifiable information to unrelated third parties.

## II.   FACTUAL BACKGROUND

**A.   The VPPA**

6. The origins of the VPPA begin with President Ronald Reagan's nomination of Judge Robert Bork to the United States Supreme Court. During the confirmation process, a movie rental store disclosed the nominee's rental history to the Washington City Paper, which then published that history. Congress responded by passing the VPPA, with an eye toward the digital

---

[1] Kevin O'Connor, *Top 10 Food Websites by Traffic*, SCRIPTED.COM, Nov. 19, 2020, https://www.scripted.com/content-marketing/top-10-food-websites-by-traffic.
[2] *Id.*

future. As Senator Patrick Leahy, who introduced the Act, explained:

> It is nobody's business what Oliver North or Robert Bork or Griffin Bell or Pat Leahy watch on television or read or think about when they are home. In an area of interactive television cables, the growth of computer checking and check-out counters, of security systems and telephones, all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch, who are some of the people they telephone. I think that is wrong.

S. Rep. 100-599, at 5-6 (internal ellipses and brackets omitted).

7. The VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710(b)(1). The VPPA defines personally identifiable information as "information which identifies a person as having requested or obtained specific video materials or services from a video service provider." 18 U.S.C. § 2710(a)(3). A video tape service provider is defined to include "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes *or similar audio-visual materials*." 18 U.S.C. § 2710(a)(4). (emphasis added)

**B.     The Facebook Tracking Pixel**

8. Facebook is the largest social networking site on the planet, averaging 2.9 billion monthly active users.[3] Facebook takes steps to be a "real identity platform," meaning that Facebook requires that usernames are the names the users go by in everyday life. A user must therefore provide their real first and last names, along with their birthday and gender.

9. Facebook generates revenue through advertising and sells advertising space and services by highlighting its ability to target users.

---

[3]     Simon Kemp, *The Latest Facebook Statistics: Everything You Need to Know*, DATAREPORTAL, August 15, 2022, https://datareportal.com/essential-facebook-stats.

10. Facebook's targeting relies on Facebook's surveillance of its users' activity both on and off facebook.com. The surveillance allows Facebook to collect data and to make inferences about users beyond what the user explicitly discloses, like their interests, behavior, and connections. Facebook compiles this information into a generalized dataset called "Core Audiences" which advertisers use to apply highly specific filters and parameters for their targeted advertisements.

11. Advertisers can also build "Custom Audiences," Custom Audiences enable advertisers to reach people who have already shown interest in the advertiser's business, whether they're loyal customers or people who have used their app or visited their website. Advertisers can use a Custom Audience to target existing customers directly, or they can use it to build Lookalike Audiences, which leverage information such as demographics, interests, and behavior from a source audience to find new people who share similar qualities. Unlike Core Audiences, Custom Audiences require an advertiser to supply the underlying data to Facebook. An advertiser can supply the information by manually uploading it or by utilizing Facebook's Business Tools, which collect and transmit the data automatically. One such Business Tool is the "Facebook Tracking Pixel."

12. The Facebook Tracking Pixel is a piece of code that advertisers, like Defendant, can integrate into their website. Once activated, the Facebook Tracking Pixel tracks individuals and the actions they take. When the Facebook Tracking Pixel captures an action, it sends a record to Facebook. Once this record is received, Facebook processes it, analyzes it, and assimilates it into datasets like the Core Audiences and Custom Audiences.

13. Advertisers control what actions (referred to as "events") the Facebook Tracking Pixel will collect and can include the website's metadata and the pages a visitor views. Advertisers

can configure the Facebook Tracking Pixel to track other standard actions, such as what content a visitor views or purchases, or generate custom tracking data.

14. Advertisers control how the Facebook Tracking Pixel identifies visitors. The Facebook Tracking Pixel is configured to automatically collect "HTTP Headers" and "Pixel-specific Data." HTTP Headers collect IP addresses, information about the web browser, page location, document referrer and persons using the website. Pixel-specific Data includes the Pixel identification number and "cookie."

**C.     Facebook Usernames and Facebook User IDs Allow Ordinary Persons to Identify Individuals**

15. According to Facebook,[4] usernames and user IDs are part of a user's public profile and are intended to allow others to find the user on facebook.com.[5]

16. A username is functionally the web address for a user's profile or page (example: facebook.com/yourname).[6]

17. A "User ID," also referred to herein as a "Facebook ID" or "FID," is a string of numbers that connects to the user's Facebook profile. Users have a User ID automatically, whether or not they choose to create a username. The User ID allows anyone with the ID to see the user's profile, including any public information. The User ID also allows other applications to connect with the user's Facebook account and to see public information, like the user's username public profile and your friend list.[7]

18. Both the Facebook username and Facebook ID allow an ordinary person to identify a specific individual.

---

[4]     *How usernames and user IDs are used on Facebook Profiles*, FACEBOOK, https://www.facebook.com/help/211813265517027.
[5]     *Id.*
[6]     *Id.*
[7]     *Id.*

**D.     TMBI Is Prohibited from Disclosing Its Subscribers' PII and Video Consumption Without Informed, Written Consent**

19.     TMBI hosts and delivers videos to its customers through, among other sites, tasteofhome.com, thehealthy.com, familyhandyman.com, and readersdigest.com.  TMBI is therefore a "video tape service provider" as defined under the VPPA and is obligated to comply with the VPPA.

20.     Under the VPPA, personally identifying information, or "PII," refers to any consumer information that would "readily permit an ordinary person to identify a specific individual's video-watching behavior." (*Eichenberger v. ESPN, Inc.*, 876 F.3d 979 (9th Cir. 2017).).

21.     TMBI is prohibited by the VPPA from disclosing PII without the consumer's informed written consent.

22.     Persons who sign-up for TMBI brand website memberships are consumers under the VPPA, as they create a profile and provide their personal details as "subscribers of goods or services" from TMBI.

23.     Additionally, TMBI produces and distributes brand-centered newsletters to which TMBI users can subscribe.  The principal purpose of the newsletters is to drive traffic to TMBI's websites.  Essentially all of the content featured in the newsletters links back to articles and videos on TMBI's various brand sites.

24.     Persons who sign up for TMBI websites newsletters are likewise consumers under the VPPA, as they provide their name and email address, identify their interests, and subscribe to services provided by TMBI.

**E.     TMBI Collects and Discloses Its Subscribers' PII and Video Consumption History**

25.     Through its various brand websites, including Reader's Digest, Taste of Home, The

Family Handyman, and The Healthy, TMBI collects viewers' personal information and shares that information with Facebook. The information shared is not encrypted, can be used by an ordinary person to identify individual users, and includes PII relating to each individual user and the user's consumption of video content.

26. TMBI's sites send the video content name and the viewers' unique Facebook ID to Facebook.

27. As noted above, a user's FID uniquely identifies that individual's Facebook account. Anyone in possession of an FID—and certainly Facebook itself—can use the identifier to locate and view the user's Facebook profile quickly and easily. TMBI understands and intends that Facebook will link the user's FID with the user's Facebook profile to document that that user had in fact viewed a particular video.

28. Upon entering a TMBI website, like readersdigest.com, users are able to enter the video section and watch the video content of their choice. In the example below the user selects an article with a video titled "4 Ways Medical Research Shows Coffee Really Might Be Good for Your Heart."



29.     Once the user clicks on and watches the video, TMBI sends Facebook the name of the video the viewer watched and the viewer's FID.



30.     Here, the viewing information of the user and the user's FID number are being

8

shared together, thereby allowing Facebook to make the direct connection between the viewing information and each individual user's FID (contained in the c_user field circled below).

```
:authority: www.facebook.com
:method: POST
:path: /tr/
:scheme: https
accept: text/html,application/xhtml+xml,application/xml;q=0.9,image/avif,image/webp,image/apng,*/*;q=0.8,application/si
accept-encoding: gzip, deflate, br
accept-language: en-US,en;q=0.9,he-IL;q=0.8,he;q=0.7
cache-control: max-age=0
content-length: 5974
content-type: application/x-www-form-urlencoded
cookie: sb=bHH2YNEafPoJdSG2h59ozIj2; datr=bHH2YOpioFwK-LWFXYsbv1J8; c_user=10006552172    ; xs=21%3APqY_aE9IGf1XgQ%3A2%
1.AWwFfkHXtYyIJ_XLVzQG6ew7Rew.Bh8X6W.nJ.AAA.0.0.BiCMPR.
origin: https://www.thehealthy.com
referer: https://www.thehealthy.com/nutrition/coffee-heart-health-doctors/
sec-ch-ua: " Not A;Brand";v="99", "Chromium";v="98", "Google Chrome";v="98"
sec-ch-ua-mobile: ?0
sec-ch-ua-platform: "Windows"
sec-fetch-dest: iframe
sec-fetch-mode: navigate
sec-fetch-site: cross-site
```

31.  TMBI thus intentionally and knowingly discloses to Facebook the user's PII, including the user's identity, the identity of the video material, and that the user had requested or obtained the given video material, all without the user's consent.

F.  **TMBI's Use of Facebook Tracking Pixel**

32.  Through the Facebook Tracking Pixel's code, the tracking cookies combine the user identifiers (e.g., the FID) with the event data (e.g., what specific video was requested by the user), allowing Facebook to know, among other things, what specific TMBI videos a specific user has watched. Facebook uses the data to link to Facebook IDs and corresponding Facebook profiles for marketing and advertising purposes, among others.

33.  By using the Tracking Pixel, TMBI knowingly discloses information that is sufficient to permit an ordinary person to identify a specific individual's video viewing behavior. The information transmitted is sufficient by itself for Facebook to identify the specific user tracked.

Furthermore, it is not encoded and is human-readable. The information TMBI knowingly discloses allows any person with Internet access to identify the specific user tracked without the use of additional or specialized knowledge or technology.

### G. TMBI's Privacy Policy and Terms of Use Do Not Constitute Informed Written Consent under the VPPA

34. As noted above, users who sign up for one of TMBI's brands are prompted to create their free account by providing their first and last name, email address, and password. Alternatively, users can create an account by linking their Facebook account. If the user elects to link their Facebook account, the user's name and email address are provided by Facebook without the need for setting an additional password.

35. At no point during any of these registration processes, regardless of the method used to sign up, are users provided with any separate notification that their viewing information and FID are being or will be shared, nor does it ask for separate consent.

36. Instead of the required notice, users are informed in small letters at the bottom of the sign-in screen that by signing in, they are agreeing to TMBI's Terms of Use. TMBI fails to meet the VPPA's requirement to notify and obtain its users' written consent to collect their private viewing information "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer."

37. TMBI's Privacy Policy states "[c]ompany may share your PII for any purposes and circumstances not prohibited by applicable law or inconsistent with the applicable Privacy Policy or any statement made by us to you in writing at the time of collection." This notice would be insufficient under the VPPA even if it were provided in the form required at the time required, which it is not.

**H.     Experience of Plaintiff Nicole Elliot**

38.     From 2007 through August 2022, Plaintiff Nicole Elliot ("Plaintiff Elliot") had a Reader's Digest subscription and subscribed to the newsletter from tasteofhome.com.

39.     Throughout the period from 2007 through August 2022, Plaintiff Elliot had a Facebook account and profile. Plaintiff Elliot's username and Facebook ID were stored in tracking cookies placed on Plaintiff Elliot's devices by both Facebook and TMBI.

40.     During that same time period, Plaintiff Elliot watched videos on tasteofhome.com on her phone and her computer. Each time Plaintiff Elliot started, stopped, or paused watching a video on one of TMBI's sites, TMBI disclosed the video's title and content along with Plaintiff's PII (including FID) to Facebook.

41.     When Plaintiff Elliot watched videos on tasteofhome.com, TMBI transmitted to Facebook the information (including her FID) stored in the local tracking cookies along with the information regarding Plaintiff Elliot's video consumption activity on TMBI's websites. By doing so, TMBI knowingly disclosed Plaintiff Elliot's PII to a third party.

**I.     Experience of Plaintiff Amanda Paige**

42.     From 2015 through the present, Plaintiff Amanda Paige ("Plaintiff Paige") had a Reader's Digest subscription and subscribed to the newsletter from tasteofhome.com.

43.     Throughout the period from 2015 through the present, Plaintiff Paige had a Facebook account and profile. Plaintiff Paige's username and Facebook ID were stored in tracking cookies placed on Plaintiff Paige's devices by both Facebook and TMBI.

44.     During that same time period, Plaintiff Paige watched videos on tasteofhome.com on her phone and her computer. Each time Plaintiff Paige started, stopped or paused watching a video on one of TMBI's sites, TMBI disclosed the video's title and content along with Plaintiff's PII to Facebook.

45. When Plaintiff Paige watched videos on tasteofhome.com, TMBI transmitted to Facebook the information (including her FID) stored in the local tracking cookies along with the information regarding Plaintiff Paige's video consumption activity on TMBI's websites. By doing so, TMBI knowingly disclosed Plaintiff Paige's PII to a third party.

**J.     Experience of Plaintiff Kathryn Fritschel**

46. From 2017 through the present, Plaintiff Kathryn Fritschel ("Plaintiff Fritschel") had a Reader's Digest subscription and subscribed to the newsletter from tasteofhome.com.

47. Throughout the period from 2017 through the present, Plaintiff Fritschel had a Facebook account and profile. Plaintiff Fritschel's username and Facebook ID were stored in tracking cookies placed on Plaintiff Fritschel's devices by both Facebook and TMBI.

48. During that same time period, Plaintiff Fritschel watched videos on tasteofhome.com on her phone and her computer. Each time Plaintiff Fritschel started, stopped or paused watching a video on one of TMBI's sites, TMBI disclosed the video's title and content along with Plaintiff Fritschel's PII to Facebook.

49. When Plaintiff Fritschel watched videos on tasteofhome.com, TMBI transmitted to Facebook the information (including her FID) stored in the local tracking cookies along with the information regarding Plaintiff Fritschel's video consumption activity on TMBI's websites. By doing so, TMBI knowingly disclosed Plaintiff Fritschel's PII to a third party.

### III.     PARTIES

50. Plaintiff Nicole Elliot is, and has been at all relevant times, a resident of Pekin, Illinois.

51. Plaintiff Amanda Paige is, and has been at all relevant times, a resident of Buffalo, Illinois.

52. Plaintiff Kathryn Fritschel is, and has been at all relevant times, a resident of Frankfurt, Illinois.

53. Defendant Trusted Media Brands Inc. is a Delaware corporation headquartered in Delaware, with its principal place of business in New York, New York. Defendant develops, owns, and operates tasteofhome.com, rd.com, thehealthy.com, and familyhandyman.com, which are used throughout New York and the United States.

## IV. JURISDICTION AND VENUE

54. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under a law of the United States (the VPPA).

55. This Court has personal jurisdiction under 28 U.S.C. § 1391 (b)(1) over Defendant because Defendant's principal place of business is in New York, New York.

56. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## V. CLASS ALLEGATIONS

57. **Class Definition:** Plaintiffs seek to represent a class of similarly situated individuals defined as all persons in the United States who have a Facebook account, subscribed to one or more of TMBI's newsletters or magazines, and viewed videos on one or more of TMBI's websites (the "Class").

58. Subject to additional information obtained through further investigation and discovery, the above-described Class may be modified or narrowed as appropriate, including through the use of multi-state subclasses.

59. **Numerosity (Fed. R. Civ. P. 23(a)(1)):** At this time, Plaintiffs do not know the exact number of members of the aforementioned Class. However, given the popularity of Defendant's websites, the number of persons within the Class is believed to be so numerous that

13

joinder of all members is impractical.

60. **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2), 23(b)(3)):** There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual members of the Class include:

(a) whether Defendant collected Plaintiffs' and the Class's PII;
(b) whether Defendant unlawfully disclosed and continues to disclose its users' PII in violation of the VPPA;
(c) whether Defendant's disclosures were committed knowingly; and
(d) whether Defendant disclosed Plaintiffs' and the Class's PII without consent.

61. **Typicality (Fed. R. Civ. P. 23(a)(3)):** Plaintiff's claims are typical of those of the Class because Plaintiffs, like all members of the Class, used TMBI's website to watch videos, and had their PII collected and disclosed by Defendant.

62. **Adequacy (Fed. R. Civ. P. 23(a)(4)):** Plaintiffs have retained and are represented by qualified and competent counsel who are highly experienced in complex consumer class action litigation. Plaintiffs and their counsel are committed to vigorously prosecuting this class action. Moreover, Plaintiffs are able fairly and adequately to represent and protect the interests of the Class. Neither Plaintiffs nor their counsel have any interest adverse to, or in conflict with, the interests of the absent members of the Class. Plaintiffs have raised viable statutory claims of the type reasonably expected to be raised by members of the Class and will vigorously pursue those claims. If necessary, Plaintiffs may seek leave of this Court to amend this Class Action Complaint to include additional representatives to represent the Class, additional claims as may be appropriate, or to amend the definition of the Class to address any steps that Defendant took.

63. **Superiority (Fed. R. Civ. P. 23(b)(3)):** A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of

the claims of all members of the Class is impracticable. Even if every member of the Class could afford to pursue individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. Individualized litigation would also present the potential for varying, inconsistent or contradictory judgments, and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues. By contrast, the maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents few management difficulties, conserves the resources of the parties and of the court system and protects the rights of each member of the Class. Plaintiffs anticipate no difficulty in the management of this action as a class action.

## VI.     CAUSES OF ACTION

### COUNT I
### VIOLATION OF THE VIDEO PRIVACY PROTECTION ACT
### 18 U.S.C. § 2710, *et seq*.

64. Plaintiffs hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

65. Plaintiffs bring this claim individually and on behalf of the members of the proposed Class against Defendant.

66. Defendant is a "video tape service provider" because it creates, hosts, and delivers hundreds of videos on its websites, thereby "engag[ing] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio-visual materials." 18 U.S.C. § 2710(a)(4). In particular, Defendant solicits individuals to subscribe to its newsletters that advertise and promote videos and articles on its websites, including tasteofhome.com.

67. Plaintiffs and members of the Class are "consumers" because they registered on Defendants' websites and/or subscribed to TMBI's newsletters. 18 U.S.C. § 2710(a)(1).

68. TMBI disclosed to a third party, Facebook, Plaintiffs' and the Class members' personally identifiable information. TMBI utilized the Facebook Tracking Pixel to cause Plaintiffs' web browser to transfer Plaintiffs' identifying information, including their Facebook ID, along with Plaintiffs' event data, like the title of the videos they viewed.

69. Plaintiffs and the Class members viewed video clips using TMBI's websites.

70. TMBI knowingly disclosed Plaintiffs' PII because it used that data to build audiences on Facebook and retarget them for its advertising campaigns.

71. Plaintiffs and the Class members did not provide Defendant with any form of consent—either written or otherwise—to disclose their PII to third parties.

72. Nor were Defendant's disclosures made in the "ordinary course of business" as the term is defined by the VPPA. In particular, TMBI's disclosures to Facebook were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership." 18 U.S.C. § 2710(a)(2).

73. On behalf of themselves and the Class, Plaintiffs seek: (i) declaratory relief; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiffs and the Class by requiring Defendant to comply with VPPA's requirements for protecting a consumer's PII; (iii) statutory damages of $2,500 for each violation of the VPPA pursuant to 18 U.S.C. § 2710(c); and (iv) reasonable attorneys' fees and costs and other litigation expenses.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs seek a judgment against Defendant, individually and on behalf of all others similarly situated, as follows:

(a) For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiffs as representatives of the Class, and naming Plaintiffs' attorneys as Class Counsel to represent the Class;

(b) For an order declaring that Defendant's conduct violates the statutes referenced herein;

(c) For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

(d) An award of statutory damages to the extent available;

(e) For punitive damages, as warranted, in an amount to be determined at trial;

(f) For prejudgment interest on all amounts awarded;

(g) For injunctive relief as pleaded or as the Court may deem proper; and

(h) For an order awarding Plaintiffs and the Class their reasonable attorneys' fees and expenses and costs of suit.

## VIII. JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b)(1), Plaintiffs demand a trial by jury of all issues so triable.

DATED:  October 13, 2022	Respectfully submitted,

LEWIS BAACH KAUFMANN
MIDDLEMISS PLLC

By:  /s/ Eric L. Lewis

Eric L. Lewis
(eric.lewis@lbkmlaw.com)
David A. Short
(david.short@lbkmlaw.com)
The Chrysler Building, 64th Floor
405 Lexington Avenue
New York, NY 10174
Telephone: (212) 826-7001
Facsimile: (212) 826-7146

NASSIRI & JUNG LLP

By: /s/ Kassra P. Nassiri

Kassra P. Nassiri (application for admission *pro hac vice* to be filed)
(kass@njfirm.com)
NASSIRI & JUNG LLP
1700 Montgomery Street, Suite 207
San Francisco, California 94111
Telephone: (415) 762-3100
Facsimile: (415) 534-3200